# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-CR-0009 (CMH) |
| | ) | |
| RAHEEM OLIVER | ) | |

**AFFIDAVIT IN SUPPORT OF**
**GOVERNMENT'S MOTION TO REVOKE CONDITIONS OF POST-CONVICTION**
**RELEASE AND ISSUE AN ARREST WARRANT**

I, Ray Campbell, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Postal Inspector employed by the United States Postal Inspection Service (USPIS). I have been a Postal Inspector with the USPIS since January 2012 and am currently assigned to the Fraud Team in the Washington Division, which investigates a variety of fraud schemes involving the use of mail. Since 2014, I have been a member of the DC Metro Area Fraud Task Force, which is composed of federal, state, and local law enforcement agencies to facilitate criminal fraud investigations and sharing information and resources with other investigators. Prior to my employment with the USPIS, I was a special agent for two federal law enforcement agencies beginning in June 2004, which included the U.S. Department of Education, Office of Inspector General and the U.S. Department of Homeland Security, Immigration and Customs Enforcement.

2. During my fourteen years as a federal criminal investigator, I have participated in and conducted a variety of criminal investigations, primarily in crimes involving fraud, cyber-crime and money-laundering. I have also led criminal investigations of mail fraud, wire fraud,

bank fraud, securities fraud and insider trading, tax fraud, bankruptcy fraud, money laundering, aggravated identity theft, child pornography, unauthorized network access, bribery in violation of the Foreign Corrupt Practices Act, and other charges. In 2004, I completed a 21-week special agent training academy at the Federal Law Enforcement Training Center in Glynco, Georgia.

3. In my capacity as a United States Postal Inspector, I was involved in the criminal investigation of RAHEEM OLIVER ("OLIVER") and others for conspiracy to commit mail and wire fraud and other criminal offenses, all relating to an extensive magazine fraud scam that targeted and victimized hundreds of elderly victims. My involvement included conducting interviews of victims, witnesses, and targets of the investigation, and reviewing financial and other records provided to the USPIS by numerous victims, financial institutions, and other entities.

4. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of, and make arrests for offenses enumerated in 18 U.S.C. § 2516. I am authorized pursuant to 22 U.S.C. § 2709(5), 28 C.F.R. § 60.3(11) and Fed. R. Crim. P. 41 to apply for issuance of an arrest warrant.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts as set forth in this affidavit, I submit that there is probable cause to believe that from late December 2018 to early January 2019, OLIVER has committed wire fraud, in violation of 18 U.S.C. § 1343, and in violation of the conditions of his post-conviction release.

2

## STATEMENT OF PROBABLE CAUSE

7. On January 9, 2019, I was contacted by a whistleblower (an individual known to law enforcement) who reported that OLIVER and his wife, T.C., defrauded or attempted to defraud a local business owner. The whistleblower stated that he had been contacted by this business owner, who provided his contact information so that law enforcement could follow up with him. On January 10, 2019, I interviewed the business owner, J.G., who is the owner of a business that repairs and sells vending machines in and around the Phoenix, Arizona area. I interviewed J.G. telephonically, and he also voluntarily provided copies of text messages, checks, and credit card information provided to him.

8. According to J.G., on or about December 22, 2018, J.G. corresponded by phone and text messages with a customer named "JAMES" who was using the phone number (602) XXX-9995 (known to law enforcement). On or about December 28, 2018, J.G. agreed to meet "JAMES" to repair a vending machine at Legends Barber Studio and to collect payment for the purchase of a new vending machine. J.G. said that after he performed the work and repaired the vending machine, "JAMES" agreed to purchase a new vending machine. The agreed upon amount, which included J.G.'s repair work, was $1,250.39. "JAMES" handed J.G. a business check for that exact amount. The business name on the check was The Oliver Group 1 (OG1) and was made payable to J.G.'s business on December 28, 2018.

9. On or about December 28, 2018, after J.G. completed the vending machine repair at Legends Barber Studio, he went back to his office to call the bank listed on the business check to verify the funds were in the OG1 account before depositing it, at which time he was told there were not enough funds in the account. J.G. then called "JAMES" and told him the check was declined, at which time "JAMES" said he needed his brother to put money into their business

account, but then instead said his brother would pay by credit card. J.G. agreed to receive payment via credit card. "JAMES" said that he and his brother, "T.V.," were in business together and he would use T.V.'s credit card. Shortly thereafter, J.G. received a text message from an unknown phone number (916) XXX-6811 (known to law enforcement) from a person calling himself "T.V." T.V. provided a credit card number and a complete billing address in New Jersey. However, J.G.'s credit card processor declined this credit card transaction.

10. Once the credit card was rejected, J.G. sent the individual calling himself "T.V." a text message to inform him. The individual responded that he was headed to Las Vegas, Nevada and needed to deposit the cash into the account. Later, T.V. continued to make up excuses, claiming that all of the ATMs he passed in Las Vegas were out of order. After additional excuses, T.V. texted a new credit card number to J.G., which he said belonged to his business partner named "V.B.', who was with him in Las Vegas and would deposit T.V.'s cash into her bank account. T.V. provided V.B.'s credit card number, with a billing address in Texas, which this time was accepted by J.G.'s credit card processor. However, J.G. was suspicious and called T.V. requesting V.B.'s phone number so that he could verify with the card holder. T.V. agreed and provided J.G. a phone number with a California area code, but after J.G. dialed the number, it just rang and rang. J.G. called T.V. again and told him the phone number was no good, at which time he was provided another phone number, which went to an automated voicemail with no name. J.G. also suspected that "T.V." and "JAMES's" voices sounded similar.

11. Realizing that he was likely being scammed and may have been given another victim's stolen credit card number, J.G. began conducting his own online research into the businesses OG1 and Legends Barber Studio, as well as the names T.V. and V.B. on the credit cards he had been provided. J.G. discovered the owner of these businesses to be OLIVER and

4

his wife, T.C., at which time he located the media reports of OLIVER's federal fraud conviction and his 14 year sentence in Virginia. He also found photographs online of OLIVER and his wife T.C. and determined "JAMES" to be OLIVER and also recognized T.C. as a female who was in the Legends Barber Studio along with "JAMES" when J.G. repaired the vending machine.

12. J.G. then called the real credit card holder V.B., using publicly available information online, and learned that she was 96 years old and she did not know a "JAMES" or anything about these transactions. V.B. said her bank had previously notified her that she was a victim of identity theft. After speaking with the 96-year-old identity theft victim, J.G. immediately issued a refund to her credit card.

13. During his online research, J.G. had located a local news article about a whistleblower in Phoenix, Arizona who had been interviewed by the media regarding his own involvement in the OLIVER fraud investigation. J.G. located the whistleblower's phone number online and called him. The whistleblower then conducted additional research and contacted the USPIS and the DOJ to report OLIVER's conduct.

14. I reviewed all of the information provided by J.G. First, I reviewed the check handed to J.G. by "JAMES." The check was a business check from OG1 dated December 28, 2018. The check's signature was compared to a copy of OLIVER's previously signed proffer agreement, which he signed in my presence on March 3, 2017. Both signatures are visibly consistent with each other. Using commercial and law enforcement databases, I also determined that the phone number being used by "JAMES" is currently registered to OGI. According to an ACC public website, OG1 was formed in May 2018 by OLIVER's wife, T.C., and the location where J.G. met "JAMES" and the female in Legends Barber Studio has been owned and managed by OLIVER since December 6, 2017.

15. The phone number used by "T.V." is a phone number used freely and anonymously through a known smart phone application that can be downloaded from the Google or Apple Store. The user of this phone number does not need to provide any verifying information, so I was unable to locate further information. However, J.G. said that he never met T.V. in person, but he did speak to him by phone after the first credit card was declined. And notably, J.G. stated that the voice of "T.V." was similar to that of "JAMES."

16. I texted the most recent mug shot of OLIVER, as well as a recent wedding photograph posted publicly on OLIVER's wife's Twitter account, to J.G. J.G. confirmed the mug shot and wedding photograph of OLIVER were images of "JAMES." Furthermore, he identified the woman in the wedding picture as the woman with "JAMES" in the Legends Barber Studio during the first meeting.

17. I also used commercial and law enforcement databases to research the name and billing address of the supposed individual "T.V.", which "JAMES" (i.e., OLIVER) had provided to J.G., claiming that T.V. was his brother. I discovered that T.V. is actually a 91-year-old man who is not related to OLIVER in any way. On January 10, 2019, I called T.V. and verified that he is 91 years old and does not know a "JAMES" or know anything about transactions in Phoenix, Arizona. T.V. said that he recently had unauthorized charges on his credit card and had cancelled the credit card's number. When I read the credit card number that "JAMES" had provided to J.G., T.V. confirmed the credit card number that he had canceled was off by only one digit, but the address was correct.

18. On January 14, 2019, I called V.B. and verified that she spoke to a man recently who told her that another man had attempted to use her credit card at his business in Arizona. She verified that she was 96 years old and never authorized any transactions in Phoenix, Arizona

or Las Vegas, Nevada. The credit card number and the billing address provided to J.G. were both accurate. She has notified her credit card company of the fraud.

19. On January 14, 2019, I reviewed evidence obtained during the search warrant of OLIVER's residence and business in 2016. At both locations, T.V. and V.B.'s phone numbers and addresses were found on OLIVER's computers within several Microsoft Excel files, which OLIVER has previously admitted to using to target elderly victims in his magazine fraud scheme.

## **CONCLUSION**

20. Based on the forgoing, I request that the Court issue an arrest warrant for RAHEEM OLIVER for violation of his post-conviction release conditions.

Respectfully submitted,

Ray Campbell
Postal Inspector
United States Postal Inspection Service